UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JANICE HYPOLITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 05-2274 |
| | ) |
| KANKAKEE COUNTY HOUSING AUTHORITY, | ) |
| | ) |
| Defendant. | ) |

**OPINION**

On December 12, 2005, Plaintiff Janice Hypolite, filed a Complaint (#1) against Defendant Kankakee County Housing Authority (KCHA) alleging she suffered adverse employment action as a result of her gender, race, and in retaliation for engaging in protected activity. This matter is now before the court on a motion for summary judgment filed by KCHA. For the reasons that follow, the motion for summary judgment is GRANTED in part and DENIED in part.

FACTS

Hypolite was hired in June 2003 as the Director of Finance for KCHA. KCHA is governed by a Board of Commissioners which during Hypolite's employment was comprised of seven members: Douglas Jones, Lillie Jones, Louis Orta, William Sawyer, Ron Sieling, Nathan Richmond, and Frances Jackson. In February 2004, Frances Jackson was replaced by Kenny Tatum. Hypolite was hired by Denise Richardson, then Executive Director of KCHA. When Richardson was

terminated in August 2003, Hypolite reported directly to the Board. As Director of Finance, Hypolite was responsible for accounts receivable, accounts payable, billing, banking transactions, financial statements, and supervising the finance department. Hypolite's initial salary was $47,000 plus a benefits package worth an additional 43% of her salary. In September 2003, Hypolite received a raise to $48,000 per year. On November 1, 2003, Hypolite received an additional raise to $58,000 per year because she accepted the position of Acting Executive Director of KCHA. As Acting Executive Director, Hypolite was responsible for the entire housing authority. Hypolite also continued to act as Director of Finance. Hypolite stepped down from the position of Acting Executive Director in February 2004 and her salary was returned to $48,000 per year. Hypolite asserts she stepped down because of the excessive workload and unfavorable treatment based upon her race, African-American. Randy McGill was then hired as the Acting Executive Director on February 25, 2004. McGill received a rate of pay of $1,200.00 per week and received no benefits.

While Hypoloite was working at KCHA, the Department of Housing and Urban Development (HUD) rated the agency as "troubled." As a result, HUD required KCHA to comply with a Memorandum of Agreement (MOA) which set forth items the Housing Authority had to accomplish so HUD did not take over the agency. Many of the requirements of the MOA were Hypolite's responsibility. Hypolite felt overwhelmed by her workload and did not complete everything necessary to comply with the MOA. In addition, the Board requested Hypolite provide Denise Richardson, the former Executive Director of KCHA, with a letter regarding her COBRA rights. Hypolite testified she never sent out the COBRA letter because she could not get around to doing it due to being short staffed.

According to Hypolite, Sawyer harassed her by sending her memos and "constantly asking

[her] to do things." Hypolite believes she may have received seven memos from Sawyer over a six month period. On September 1, 2003, Sawyer sent a memo to Hypolite inquiring about a report due to HUD on August 31, 2003, which Sawyer stated was critical to the survival of KCHA. Hypolite did not know how to complete the form. Hypolite testified that Joy Coleman of HUD told her not to complete the form, but Hypolite did not pass this information to Sawyer or anyone else on the Board. On February 4, 2004, Sawyer sent Hypolite a memo confirming the Board's direction to Hypolite that she research and identify various information in response to a report issued by the Office of the Inspector General. Sawyer indicated that the information needed to be provided within 30 days, but Hypolite did not provide this requested information within that time. Hypolite indicates this was due to staff shortage and an excessive workload.

Elaine Ostrowski was assigned to KCHA by HUD because of KCHA's "troubled" status. Ostrowski was designated a Board Advisor. On February 13, 2004, Ostrowski sent a memo to Hypolite regarding the February 4 request from Sawyer to see how she was doing on the project as the halfway point approached. Hypolite responded to the memo by stating she had not been able to look at the files due to her workload but would concentrate on that project if Ostrowski wanted her to do that instead of her other tasks. Also on February 13, 2004, Ostrowski sent a memo to Hypolite asking her to review the requirements of the MOA for January and February and provide draft responses by February 19, 2004. Hypolite did not provide the information until February 24, 2004. On February 17, 2004, Hypolite received a letter from HUD stating that the HUD Recovery Prevention Corporation would be arriving at KCHA on February 25, 2004, and requesting certain information. Hypolite did not have the documentation available to the HUD team when they arrived. Hypolite testified that she assigned this task to someone else to complete.

On March 1, 2004, McGill provided Hypolite with a list of information requested by Kenny Tatum, a new board member, and asked that she respond to the request by March 5, 2004. Hypolite requested and received an extension from McGill until March 12, 2004, to supply the information. Hypolite did not provide this information. Also on March 1, 2004, McGill sent Hypolite a memo asking her to provide information on outstanding bills which had previously been requested by the Board. Hypolite assigned this task to Kevin Miller[1], the accounts payable clerk, with a response which she transmitted to McGill. Hypolite indicated to McGill that she did not believe the information was accurate because certain bills were missing from the list.

There was also an incident in which the health insurance premium was not paid for union employees. As a result, the health insurance coverage for these employees was canceled. Hypolite alleges that this was the fault of Miller. Hypolite testified that Sawyer nonetheless held her responsible. Sawyer called Hypolite twice per week regarding the issue, which Hypolite found to be insensitive because she had a number of other things to do. McGill also asked Hypolite about the insurance matter when he became Acting Executive Director. On February 20, 2004, Sawyer sent a memo to Hypolite requesting information on the insurance cancellation be provided to him by the close of business on February 23, 2004. Hypolite testified she did not recall whether she provided the information by that date, but did respond. On February 25, 2004, Sawyer sent another memo to Hypolite identifying deficiencies in her job performance including her failure to respond

---

[1] Hypolite directly supervised Miller and continued to do so when she was Acting Executive Director. Miller was responsible for preparing accounts payable checks and presenting them to Hypolite for her to authorize payment. Miller had been negligent in the payment of bills, and Hypolite issued verbal and written warnings to him. Hypolite never took any steps to terminate Miller, but believes that McGill did not take any steps to terminate Miller because Miller is white and was friendly with McGill.

to the request for information on the insurance issue. The memo further indicated that Hypolite could face disciplinary action for "failure to properly oversee timely payment of KCHA obligations." Hypolite considered this an act of harassment and an adverse employment action.

Hypolite further believes that Sawyer harassed her by conducting a meeting in her office in September 2003 because she believed she should have been a part of the meeting. Hypolite asserts that Sawyer yelled at her for going back into her office without knocking. Hypolite further asserts that Sawyer once called her a "dumb nigger." According to Hypolite, Sawyer made this remark in her office in February 2004 while she was properly identifying documents to be destroyed because he did not believe she should be doing it. No one else besides Sawyer and Hypolite was present when this alleged incident occurred. Jackson submitted an affidavit indicating Sawyer had called Frank Mason, a former executive director of KCHA from September 2000 to August 2001, a "nigger."

Hypolite further alleges she was harassed by Ron Seiling. According to Hypolite, Seiling spoke to her about handling the administrative building's gardening needs. After arguing about the issue, Hypolite stated they would have to agree to disagree. According to Hypolite, Seiling became angry. Seiling stated that when he gets angry, he gets loud. Hypolite interpreted this as a threat. Seiling further told Hypolite that she was bright enough to have made it at the housing authority. Hypolite interpreted this statement as relating to her race. Hypolite also believed Seiling harassed her by interviewing a candidate for an accounts receivable position whom Hypolite had already interviewed. Hypolite further believed Seiling was harassing her by asking her to do various things related to the Housing Authority.

Hypolite asserts that Caucasian employees were generally treated differently than African-

American employees. One of the Caucasian employees Hypolite points to is Jim Pitts, the Maintenance Supervisor for KCHA. Hypolite further claims that a Caucasian property manager, Leon Madrowski, was treated differently than an African-American property manager, Jacqueline Waters, by Ostrowski. However, Hypolite has no specific knowledge on this different treatment and does not believe either employee performed well. Ostrowski also allowed McGill to chair meetings which Hypolite had not chaired when he became Acting Executive Director. Hypolite believes when McGill took over he discriminated against her by writing memos to her, not dealing with Miller, and following up on memos sent to her by Sawyer.

On February 27, 2004, Hypolite filed her first charge of discrimination with the EEOC alleging unequal wages due to her race, racial harassment, and receiving a warning from Sawyer based on her race. According to Hypolite, McGill told her in March 2004 that she should not have filed her charge. Hypolite asserts that she was asked to do work as a punishment for having filed the charge. On March 25, 2004, Hypolite was terminated and was provided with a letter identifying the reasons for her discharge. The reasons listed included her failure to complete several tasks, her failure to ensure that KCHA's bills were paid on time, and her lack of urgency in resolving the insurance coverage problem. The letter also cited Hypolite's failure to respond to requests for information about outstanding bills, failure to provide a response to the Office of the Inspector General's Report, and failure to send a COBRA letter to Denise Richardson. Jackson, who served on the Board until February 2004, submitted an affidavit indicating Hypolite performed her job duties adequately and without incident.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, the court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In reaching this decision, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The burden of establishing that no genuine issue of material fact exists rests with the movant. Jakubiec v. Cities Serv. Co., 844 F.2d 470, 473 (7th Cir. 1988).

1. Hostile Work Environment Claim

Hypolite first brings a claim for hostile work environment based upon her race.  To survive summary judgment on a hostile work environment claim, Hypolite must establish that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe and pervasive enough to alter the conditions of her employment and create a hostile and abusive working environment; and (4) there is a basis for employer liability. Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004).  When evaluating a hostile work environment claim, this court analyzes the totality of the circumstances, including "the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Patt v. Family Health Sys., Inc., 280 F.3d 749, 754 (7th Cir. 2002).

The thrust of Hypolite's hostile environment claim is the alleged incident in which Sawyer

called Hypolite a "dumb nigger."[2] The Seventh Circuit has stated that there is "no magic number" of racial slurs to constitute a hostile environment. Cerros v. Steel Tech., Inc., 288 F.3d 1040, 1047 (7th Cir. 2002). Because some of these words are so outrageous, a single incident may qualify for a hostile environment claim. Cerros, 388 F.3d at 1047. The Seventh Circuit has further indicated that "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Rodgers v. Western-Southern Life Ins., 12 F.3d 668, 675 (7th Cir. 1993) (citations omitted).

Even when taking the facts in the light most favorable to Hypolite, she has not stated an actionable hostile environment claim. The alleged comment made by Sawyer was made in the privacy of Hypolite's office and not in front of co-workers or subordinate employees. In Walls v. Turano Baking Co., 221 F. Supp. 2d 924 (N. D. Ill. 2002), the court granted summary judgment on a hostile environment claim in circumstances similar to the instant case. In Walls, the plaintiff alleged that his supervisor referred to him as a "nigger" in a conversation with a third party that was overheard by the plaintiff. Walls, 221 F. Supp. 2d at 930. The court found this allegation insufficient to sustain a hostile environment claim, even when taken in conjunction with an allegation that the supervisor used racial epithets in an altercation with another employee and an

---

[2] This court notes that the reliability of this allegation is dubious. Hypolite never made this specific allegation in either of two charges she filed with the Equal Employment Opportunity Commission, nor did Hypolite complain to anyone at the Housing Authority after the alleged comment was made. Hypolite did not bring this allegation in her complaint in this matter, and alleges she told only her daughter that it happened. In addition, KCHA submitted an interrogatory to Hypolite asking her to disclose every racially derogatory statement made to her by anyone at KCHA, and this statement was not disclosed. However, for purposes of summary judgment, this court will accept the allegation as true.

allegation that other co-workers used racial slurs directed at African-Americans. <u>Walls</u>, 221 F. Supp. 2d at 930-31. In the instant case, Hypolite makes no allegation of racial slurs with the exception of an allegation that Sawyer referred to another employee as a "nigger" years prior to Hypolite's termination when Hypolite was not present. However, "[i]solated comments made by a supervisor to employees other than plaintiff and outside of plaintiff's presence, while offensive, are not actionable as harassment under Title VII." <u>Walls</u>, 221 F. Supp. 2d at 930, <u>citing</u> <u>Ngeunjuntr v. Metropolitan Life Ins. Co.</u>, 146 F.3d 464, 467 (7th Cir. 1998).

The primary other evidence Hypolite alleges in support of her hostile environment claim is that she felt overworked. However, Hypolite has provided no evidence that other employees at KCHA were less burdened with work or that her job responsibilities were somehow connected to her race. Any other allegation made by Hypolite, such as her argument with Seiling regarding gardening needs or her argument with Sawyer after he conducted a meeting in Hypolite's office, do not rise to the level of a hostile work environment as these incidents were neither severe nor pervasive such as to create a hostile and abusive situation. See <u>Ezell v. Potter</u>, 400 F.3d 1041, 1047 (7th Cir. 2005). Accordingly, this court concludes summary judgment is appropriate on Hypolite's hostile environment claim.

### 2. Race Discrimination Claim[3]

A claim of discrimination under Title VII may be proven directly or indirectly. <u>O'Neal v. City of New Albany</u>, 293 F.3d 998, 1003 (7th Cir. 2002). Hypolite may avert summary judgment

---

[3] In her complaint, Hypolite also alleged a claim for sex discrimination. However, Hypolite did not respond to KCHA's motion for summary judgment with regard to this claim. Therefore, this court deems Hypolite to have conceded the motion as to this claim. This court further finds that there is a complete lack of evidentiary support for a sex discrimination claim.

first by "putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the McDonnell Douglas formula." Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 719 (7th Cir. 2005).  The direct method relies on direct and circumstantial evidence to show an inference of intentional discrimination. "Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision." Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 272 (7th Cir. 2004).  "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997).  While isolated inappropriate remarks do not constitute direct evidence of discrimination, "remarks that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." Venters, 123 F.3d at 973.

In the instant case, Hypolite alleges that Sawyer called her a "dumb nigger."  Sawyer undisputedly was a decisionmaker with regard to Hypolite's termination.  Sawyer served on the Board of Commissioners which voted to terminate Hypolite's employment.  While Sawyer did not single-handedly terminate Hypolite, he was a decisionmaker and was able to influence other members of the Board.  Further, the remark was made relatively close in time to the termination decision, approximately one month prior to Hypolite's termination.  While KCHA has presented evidence that Hypolite's discharge was justified on grounds other than her race, this evidence does

not eliminate any doubt as to whether her race played at least a motivating role in her discharge. See Venters, 123 F.3d at 974. Accordingly, this court concludes that summary judgment cannot be granted because it will be for a jury to decide whether this statement was made and the import of the statement. See Simmons v. Village of Willow Springs, 2004 WL 2036405 at *13 (N. D. Ill. 2004).[4]

### 3. Retaliation Claim

Hypolite also asserts that KCHA retaliated against her by discharging her for filing her initial charge of discrimination with the EEOC. In order to establish a claim for retaliation, Hypolite may present direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two. Haywood v. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003). There is no dispute for purposes of summary judgment that Hypolite engaged in statutorily protected activity and suffered an adverse employment action.

As to the element of causation, Hypolite filed her initial charge of discrimination with the EEOC on February 26, 2004. She was terminated one month later on March 26, 2004. Hypolite testified in her deposition that McGill stated to her in March 2006 that she "should not have filed her charge." McGill states in an affidavit attached to KCHA's motion for summary judgment that he did not recommend Hypolite's termination nor did he have any input in the decision to discharge her. However, in response to an interrogatory asked by Hypolite regarding her termination, KCHA stated, "Plaintiff was terminated on March 26, 2004 by Randy McGill with the approval of the Board of Commissioners." Furthermore, the jury could infer that McGill played a role in the

---

[4] Because this court concludes summary judgment is not warranted based upon the direct method of proof, there is no need to evaluate Plaintiff's claim under the McDonnell Douglas framework. See Simmons, 2004 WL 2036405 at *14.

termination decision because he was Acting Executive Director at the time. In addition, McGill signed the letter in which Hypolite was informed of her termination. "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied." Culver v. Gorman & Co., 416 F.3d 540, 546 (7th Cir. 2005). Viewing the evidence in the light most favorable to Hypolite, she has sufficiently demonstrated a causal link between her complaint to the EEOC and her termination.

"Once the plaintiff has succeeded in making a prima facie case, the burden of production shifts to the defendant to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct." Culver, 416 F.3d at 546. "The persuasiveness of the defendant's explanation is normally 'for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point.'" Culver, 416 F.3d at 546, quoting Venters, 123 F.3d at 973. As stated above, this court cannot make that determination after construing the evidence in the light most favorable to Hypolite. Accordingly, summary judgment is not appropriate on Hypolite's retaliation claim.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#21) is GRANTED in part and DENIED in part. Summary judgment is granted as to Plaintiff's hostile work environment and sex discrimination claims and denied as to Plaintiff's race discrimination and retaliation claims.

(2) This case remains set for a final pretrial conference on February 23, 2007, at 1:30 p.m. and a jury trial commencing March 5, 2007, at 9:00 a.m.

ENTERED this 1st day of February, 2007.

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF JUDGE